**SEALED**

**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF FLORIDA**
**MIAMI DIVISION**



FILED BY ___ D.C.

**SEP 2 9 2025**

ANGELA E. NOBLE
CLERK U.S. DIST. CT.
S. D. OF FLA. - MIAMI

|  |  |
|---|---|
| UNITED STATES OF AMERICA, <br> *ex rel.* <br> H REMIDEZ, LLC <br><br>          Plaintiff, <br><br> v. <br><br> BRAMAN IMPORTS, INC; BRAMAN MOTORS, INC.; and PALM BEACH IMPORTS, INC. <br><br>          Defendants. | CASE NO.: <br><br> **COMPLAINT PURSUANT TO FEDERAL FALSE CLAIMS ACT, 31 U.S.C. § 3729 *et seq.*,** <br><br> **FILED *IN CAMERA* AND UNDER SEAL PURSUANT TO 31 U.S.C. § 3730** <br><br> **NOT FOR PUBLIC DISCLOSURE DO NOT PLACE IN PRESS BOX DO NOT ENTER ON PACER** <br><br> **JURY TRIAL DEMANDED** |

## *QUI TAM* COMPLAINT

### INTRODUCTION

1. Despite certifying their compliance with federal regulations governing emergency financial aid from taxpayers, three auto dealers broke the rules restricting Paycheck Protection Program ("PPP") loans to small businesses, making them ineligible for the program and $14.8 million in principal and interest forgiven by the Small Business Administration ("SBA").

2. At the onset of the pandemic, Congress earmarked taxpayer-backed loans of up to $10 million to small businesses by restricting participation to

1

companies that employed 500 or fewer and qualified as a small business concern as defined by the SBA.

3. Legislators tightened the restrictions in the program's second phase, reducing loans to $2 million or less for firms with 300 or fewer employees. The enabling legislation and SBA regulations prohibited applicants from exceeding the 300-employee threshold for these Second Draw PPP Loans.

4. Braman Imports, Inc. ("Imports"), Braman Motors, Inc. ("Motors"), and Palm Beach Imports, Inc. ("Palm Beach") (collectively, "Defendants") exceeded the loan program's size restrictions, making them ineligible to participate and receive individual loans from the First Draw PPP Loan program. Still, the SBA forgave the outstanding loan balance and associated interest because the Defendants submitted loan forgiveness applications reiterating their eligibility by certifying the number of workers employed, compliance with SBA size restrictions, and attesting that the information provided was true and correct. Those representations were false.

5. The Defendants completed loan applications, certifying they were eligible when they were not, despite asserting that the information submitted was true and correct and acknowledging that making materially false statements violated federal law.

6.     The Defendants knowingly falsely certified compliance to circumvent the SBA-imposed size restrictions. Their actions caused the submission of false claims to the SBA in violation of the federal False Claims Act, 31 U.S.C. §§ 3729, et seq. ("False Claims Act" or "FCA") and fraudulently induced the issuance and forgiveness of taxpayer-backed loans that otherwise would have been denied as ineligible.

7.     This action seeks to recover on behalf of the United States damages and civil penalties arising from the purposeful submission of false and/or fraudulent claims to the Government.

## PARTIES

8.     Relator H Remidez, LLC, is a Texas limited liability company. Dr. Herbert Remidez, Jr. is the company's president, secretary, and treasurer. Dr. Remidez holds a Ph.D. in Information Science and Learning Technologies from the University of Missouri at Columbia. He has worked as a faculty member in the Satish and Yasmin Gupta College of Business at the University of Dallas since 2010, where he currently serves as a tenured Associate Professor. From 2014 through the present, Dr. Remidez has taught business analytics courses with a focus on cloud computing, big data analytics, predictive modeling, advanced business analytics, and artificial intelligence in the University's Master of Science in Business Analytics degree program. He is the Program Director for the

3

University's MS Business Analytics and MS Data Science and AI programs. Dr. Remidez used advanced, proprietary data analytics to identify the fraud specified here.

9. Defendant Braman Imports, Inc. of Miami, Florida is a member of Braman Enterprises, which is based in Miami.

10. Defendant Braman Motors, Inc. of Miami, Florida is a member of Braman Enterprises, which is based in Miami.

11. Defendant Palm Beach Imports, Inc. of Miami, Florida is a member of Braman Enterprises, which is based in Miami.

## JURISDICTION AND VENUE

12. This action arises under the FCA. This Court has jurisdiction over this action pursuant to 28 U.S.C. § 1331, 28 U.S.C. § 1345, and 31 U.S.C. § 3732(a), which specifically confer jurisdiction on this Court for actions brought under 31 U.S.C. § 3730.

13. This Court has personal jurisdiction over Defendants pursuant to 31 U.S.C. § 3732(a), which authorizes nationwide service of process, because Defendants can be found in, reside in, have transacted business in, and/or have committed the alleged acts in this District.

14. Venue is proper in this District pursuant to 28 U.S.C. § 1391(b)-(c) and 31 U.S.C. § 3732(a) because Defendants can be found in, reside in, and/or have transacted business in this District.

15. Relator knows of no other FCA complaints that have been filed against Defendants alleging the same or similar actions. Additionally, Relator is an original source as defined in 31 U.S.C. § 3730(e)(4)(B). The Relator made voluntary disclosures to the United States before filing this lawsuit.

## REGULATORY FRAMEWORK

### The FCA

16. The FCA reflects Congress' objective to "enhance the Government's ability to recover losses as a result of fraud against the Government." S. Rep. No. 99-345 at 1 (1986). As relevant to this case, the FCA establishes liability for an individual or entity that:

(A) knowingly presents, or causes to be presented, a false or fraudulent claim for payment or approval;

(B) knowingly makes, uses, or causes to be made or used, a false record or statement material to a false or fraudulent claim;

(G) knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

31 U.S.C. § 3729(a)(1).

5

17. The FCA defines "knowing" and "knowingly" to mean that a person with respect to information "(i) has actual knowledge of the information; (ii) acts in deliberate ignorance of the truth or falsity of the information; or (iii) acts in reckless disregard of the truth or falsity of the information." 31 U.S.C. § 3729(b)(1)(A). No proof of specific intent to defraud is required, and an innocent mistake is not a defense to an action under the FCA. 31 U.S.C. § 3729(b)(1)(B).

18. An "obligation" within the meaning of the FCA includes "[a]ny overpayment retained by a person after the deadline for reporting and returning the overpayment." 42 C.F.R. § 401.305(b).

19. In addition to treble damages, the FCA provides for the assessment of civil penalties for each violation. 31 U.S.C. § 3729(a)(1)(G).

### The CARES Act

20. Enacted on March 27, 2020, the Coronavirus Aid, Relief and Economic Security (CARES) Act was designed to provide emergency financial assistance to millions of Americans suffering from the economic effects caused by the COVID-19 pandemic. Section 1102(a)(2) of the Act established the PPP by amending Section 7(a) of the Small Business Act, 15 U.S.C. § 631. The SBA administers the program.

21. The initial and subsequent Congressional relief packages included authorization for up to $930 billion in forgivable loans to small businesses for job

6

retention and certain other expenses through the PPP. The taxpayer-backed loans were awarded in two tranches: First Draw PPP Loans and Second Draw PPP Loans.

22.     Private lenders, such as financial institutions, processed and approved or rejected PPP loan applications. These lenders funded the approved loans using their own money, although the SBA guaranteed the loans. SBA paid the lenders a fee based on the size of the loan.

23.     On December 27, 2020, President Donald J. Trump signed the Economic Aid to Hard-Hit Small Businesses, Nonprofits and Venues Act authorizing the SBA to guarantee Second Draw PPP Loans. Section 311 authorized SBA to guarantee loans to borrowers who previously received First Draw PPP Loans and used the proceeds for authorized purposes.

24.     Enacted in the early days of the pandemic, the PPP program's purpose was to support the economy by providing federally funded, guaranteed, and forgivable loans to businesses as quickly as possible through the SBA. To expedite the loans, Congress broadened eligibility requirements for borrowers and created a bare-bones set of lending requirements for the private financial institutions that issued the loans.

25.     The stripped-down lending rules simply required eligible recipients to certify that the loan was necessary, the money would be used for allowed purposes,

7

and the borrower did not already have a PPP loan. SBA regulations allowed lenders to rely on these borrower certifications.

26.     To obtain a First or Second Draw PPP loan, individuals and businesses must complete an application in which an authorized representative acknowledges the program rules and makes specific affirmative certifications.

27.     The First Draw PPP Loan application required applicants to initial eight separate certifications attesting compliance with federal law and SBA eligibility regulations, including:

> I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 USC 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 USC 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 USC 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

28.     SBA required each applicant for a Second Draw PPP Loan to make 15 separate certifications, including the same attestation found in the First Draw PPP Loan application certifying compliance with federal law and SBA regulations:

> I further certify that the information provided in this application and the information provided in all supporting documents and forms is true and accurate in all material respects. I understand that knowingly making a false statement to obtain a guaranteed loan from SBA is punishable under the law, including under 18 U.S.C. 1001 and 3571 by imprisonment of not more than five years and/or a fine of up to $250,000; under 15 U.S.C. 645 by imprisonment of not more than two years and/or a fine of not more than $5,000; and, if submitted to a federally insured institution, under 18 U.S.C. 1014 by imprisonment of not more than thirty years and/or a fine of not more than $1,000,000.

29.     To obtain a First Draw loan, federal law and SBA regulations require applicants to employ no more than 500 and qualify as a small business concern, after applying the agency's affiliation rules.

30.   The size of a business concern is determined under the SBA's size standards as they apply to the "concern whose size is at issue and all of its domestic and foreign affiliates." 13 C.F.R. § 121.301(f)(6).

31.   On April 2, 2020, SBA posted a regulation that told borrowers what they needed to know and do to obtain a First Draw PPP Loan. The agency published the same rule on April 15, 2020. It said:

2. What do borrowers need to know and do?

a. Am I eligible?

You are eligible for a PPP loan if you have 500 or fewer employees whose principal place of residence is in the United States, or are a business that operates in a certain industry and meet the applicable SBA-employee-based size standards for that industry, and:

i.   You are:

A. A small business concern as defined in section 3 of the Small Business Act (15 U.S.C. 632), and subject to SBA's affiliation rules under 13 CFR 121.301(f) unless specifically waived in the ACT…

Business Loan Program Temporary Changes; Paycheck Protection Program, 85 Fed. Reg. 20811, 812 (April 15, 2020).

32.   The SBA publishes a table of small business size standards that are, for the most part, expressed in either the millions of dollars or the number of employees. On the website introducing the size standards, the agency noted:

9

A size standard is the largest that a concern can be and still qualify as a small business for Federal Government programs.

33. The SBA defines affiliation as one firm having the power to control another or a single person or entity having the ability to control both. 13 CFR § 121.103(a)(1) describes the SBA's general principles of affiliation and defines control:

Concerns and entities are affiliates of each other when one controls or has the power to control the other, or a third party or parties controls or has the power to control both. It does not matter whether control is exercised, so long as the power to control exists.

34. Further, 13 CFR §121.103(a)(4) adds: "Affiliation may be found where an individual, concern, or entity exercises control indirectly through a third party."

35. Where the SBA concludes that firms are affiliated, it combines their revenues and the number of employees of all its domestic and foreign affiliates before comparing the aggregated amounts to the program's size limit. 13 CFR § 121.103(a)(6).

36. The CARES Act waived the affiliation rules for certain business concerns, including companies in the hotel and restaurant industry, businesses listed in the SBA's franchise directory, and businesses receiving financial assistance from a licensed Small Business Investment Company. 15 U.S.C. § 636(a)(36)(D)(iv).

10

37. SBA regulations also provide an alternative method for determining whether PPP applicants qualify as a small business concern. Implemented by the Small Business Jobs Act of 2010, the alternative size standard qualifies a company as a small business using the entity's net worth and net income.

38. The standard in place from 2010 through March 18, 2024 said: (1) The maximum tangible net worth of the business is not more than $15 million; and, (2) The average net income after Federal income taxes (excluding any carry-over losses) of the business for the two full fiscal years before the date of the application is not more than $5 million.

39. SBA restated the rule in an FAQ published on April 6, 2020, adding that an applicant must comply with the rule as of March 27, 2020. *See* Paycheck Protection Program Loans — Frequently Asked Questions, U.S. Small Business Administration & U.S. Department of the Treasury, FAQ No. 2 (Apr. 6, 2020); *see also* Business Loan Program Temporary Changes; Paycheck Protection Program as Amended by the American Rescue Plan Act, 86 Fed. Reg. 15085, 15086 n.5 (Mar. 22, 2021) (restating that under SBA's "alternative size standard," a business concern may qualify as a small business concern if it, together with affiliates, has (1) a maximum tangible net worth not more than $15 million, and (2) an average net income after federal income taxes for the two full fiscal years before application not more than $5 million).

11

40.    The SBA and the Department of the Treasury also published regulations and guidance describing the criteria for a PPP borrower to obtain loan forgiveness. SBA required applicants to complete a detailed loan forgiveness application certifying compliance with federal law and regulations.

41.    The loan forgiveness calculation portion of the application required borrowers to provide the SBA with the number of employees at the time of their loan application and at the time of the loan forgiveness application. The SBA also required borrowers to detail eligible payroll costs and provide supporting documentation.

42.    The application required borrowers to maintain documentation supporting the loan request's necessity and the borrower's eligibility. It said:

> **<u>Documents that Each Borrower Must Maintain but is not Required to Submit</u>**
>
> All records relating to the Borrower's PPP loan, including documentation submitted with its PPP loan application, documentation supporting the Borrower's certifications as to the necessity of the loan request and its eligibility for a PPP loan, documentation necessary to support the Borrower's loan forgiveness application, and documentation demonstrating the Borrower's material compliance with PPP requirements.

43.    Borrowers certified the payroll costs and said, "The information provided in all supporting documents and forms is true and correct in all material respects."

44.     Knowingly making a false statement to obtain loan forgiveness subjects borrowers to imprisonment of not more than five years and/or a fine of up to $250,000 under 18 U.S.C. § 1001 and imprisonment of not more than two years and/or a fine of not more than $5,000 under 15 U.S.C. § 645.

45.     False statements submitted to a federally insured institution are punishable by imprisonment of up to 30 years and/or a fine of not more than $1 million under 18 U.S.C. § 1014.

46.     The May 5, 2020, and subsequent applications said directly above the signature line of the authorized representative of the borrower:

> The Borrower's eligibility for loan forgiveness will be evaluated in accordance with the PPP regulations and guidance issued by SBA through the date of this application. SBA may direct a lender to disapprove the Borrower's loan forgiveness if SBA determines that the Borrower was ineligible for the PPP loan.

47.     A June 26, 2020 interim final rule published by the SBA emphasized that the SBA would not forgive PPP loans of ineligible borrowers. It said:

> If SBA determines in the course of its review that the borrower was ineligible for the PPP loan based on the provisions of the CARES Act, SBA rules or guidance available at the time of the borrower's loan application, or the terms of the borrower's PPP loan application (for example, because the borrower lacked an adequate basis for the certifications that it made in its PPP loan application), the loan will not be eligible for forgiveness.

13

Business Loan Program Temporary Changes; Paycheck Protection Program-Revisions to Loan Forgiveness and Loan Review Procedures Interim Final Rules, 85 Fed. Reg. 38304, 306 (June 26, 2020).

48.     SBA reiterated that ineligible PPP borrowers would not be eligible for loan forgiveness in rules and regulations published in the Federal Register on February 5, 2021.

49.     On August 19, 2022, an IRS memorandum concluded that taxpayers whose PPP loan was forgiven must include the PPP loan proceeds in gross income, even though the taxpayer did not qualify for forgiveness.

## RELATOR'S METHODOLOGY

50.     In 2020, Dr. Remidez, the principal of the Relator, used his knowledge of advanced analytics in conjunction with various cloud computing software packages that rely on artificial intelligence ("AI") to review electronic information maintained by the SBA detailing PPP loans made to individuals, sole proprietorships, and companies across the country.

51.     Dr. Remidez assembled a PPP-loan database of 67 separate and related tables ranging in size from 2,840 to 8.8 million rows. Database tables organize information into rows and columns, much like an Excel spreadsheet, making it easier to store and compare.

14

52.     His analysis began by converting each of the PPP program regulations and guidance into software rules that could be used to help examine the hundreds of billions of dollars in taxpayer-backed loans.

53.     After structuring and organizing the SBA data, Dr. Remidez augmented his PPP-loan database with information from 27 separate sources, including:

- non-profit tax information maintained by the Internal Revenue Service;

- data from the U.S. Treasury, the Department of Labor, the Federal Deposit Insurance Corporation;

- legislative lobbying records held by Congress;

- datasets detailing individuals and companies debarred or excluded from federal contracting, businesses registered under the Foreign Agents Registration Act, investment firms supervised by the Securities and Exchange Commission ("SEC"), and firms that are traded on national stock exchanges; and,

- Centers for Medicare & Medicaid Services data related to facility ownership.

54.     These datasets use different naming conventions and identifiers, making an electronic comparison impossible. Resolving these differences to allow

15

an accurate comparison required exploratory analysis, data preparation, and the development of customized computer code, commonly called recipes, to identify and resolve inconsistencies and anomalies. In this case, the data "cleaning" process used customized software recipes with as many as 59 steps.

55. These cleaning steps include, for example, removing leading and trailing whitespaces, replacing missing values, and converting names to uppercase. This cleaning process was applied to each of these varied datasets. Many of the database inquiries used to standardize the information required hours to complete.

56. Dr. Remidez then employed an entity resolution software program powered by AI. AI can be categorized as generative or discriminative. The AI-assisted entity resolution software systems used in this analysis are discriminative AI systems.

57. Generative systems, like ChatGPT or Stable Diffusion, generate new text output or images based on training from massive datasets. Discriminative AI systems are used for classification or regression and return a prediction based on conditional probability. One example of these systems is the time travel predictions made by Google Maps. The AI-assisted entity resolution software systems used as part of this analysis are discriminative AI systems.

58. Entity resolution software determines whether records from diverse sources match. Record-matching programs can match names with slight

misspellings, accent marks, and abbreviations. They cannot recognize relationships within the data or update results to incorporate newly added information. AI-driven programs perform rudimentary matching while incorporating additional techniques to recognize what the underlying data strings represent.

59.     The AI software used by Dr. Remidez recognizes common nicknames, common misspellings, and variations on the same address. For example, the AI learning model equates Jim with James, Bill with William, and Mohammed with Mohammad. It also recognizes and matches address variations, such as 1 First St. and One 1st Street. When new information is added, the AI-driven software dynamically updates. In simple terms, it "learns" with every update.

60.     In the spring and fall of 2021, Dr. Remidez used advanced analytics techniques, including AI, to review electronic information maintained by the SBA detailing PPP loans to individuals, sole proprietorships, and companies across the country. His review of PPP loans to Arizona borrowers in November 2021 shows the differences between conventional and AI-driven software analysis. An analysis using Microsoft Excel found 209 duplicate borrowers among 128,807 loans. After cleaning the data, Excel identified 253. Using the same data, the AI-driven software labeled 865 as duplicates, four as possible duplicates, and 24,000 as possibly related.

17

61. In this example, after adding eight additional data sets – comprising medical practices and business addresses, Economic Injury Disaster Loans, resident visa applications, Shuttered Venue, and Restaurant Revitalization loans – the duplicates increased by 63, and the possibly related category fell by 2,600.

62. While these results are impressive, all AI systems are fallible. To mitigate errors, Dr. Remidez compared the results against additional records, such as state business registries, and employed other filters and software to verify the outcome. Finally, Dr. Remidez manually checked the results.

63. Dr. Remidez augmented his databases with information from the SEC, USAspending.gov, which maintains spending records on other pandemic aid programs, and various publicly available datasets detailing corporate ownership.

64. The matching process allowed Dr. Remidez to identify loan recipients and affiliates who exceeded the SBA size restrictions.

65. Because federal law and regulations exempted businesses with certain North American Industry Classification System ("NAICS") codes, such as those beginning with 72, 511110, and 5151 – categories that include hotels, restaurants, and news organizations – Dr. Remidez eliminated these companies from his analysis.

66. Dr. Remidez further refined his analysis by eliminating companies from business sectors exempted from the 500- and 300-employee cap and firms

18

specializing in convention and trade shows because they likely had fewer than 300 employees when applying for a First Draw PPP Loan.

67. After a rigorous electronic and manual review of the results to ensure accuracy, Dr. Remidez applied the software rules he developed from PPP loan program regulations to identify violations of the eligibility criteria.

68. Although Relator used publicly available information, the Relator is the original source of the allegations and the proprietary analysis, methodology, and data synthesis detailed herein.

## ALLEGATIONS

69. To obtain a PPP loan, businesses were required to complete an application in which an authorized representative acknowledged the program rules and certified, among other things, their company's average monthly payroll expenses and the number of employees. These components were used to calculate the size of the loan each small business was eligible to receive.

70. On the First Draw PPP Loan application, the SBA required borrowers to disclose whether the applicant is a franchise listed in the SBA's Franchise Directory. The CARES Act exempted franchises from the SBA affiliation rules.

71. The application warns that making a false statement is punishable by up to a 30-year prison term and/or a $1 million fine.

19

72.    Braman Enterprises is one of the top auto dealer groups in the country, selling brands that include Bentley, Bugatti, Acura, Audi, Kia, Honda, Hyundai, Rolls-Royce, Porsche, Mini, Cadillac, Mercedes, and BMW. Its Miami and West Palm Beach stores are two of the best-selling luxury dealerships in the nation, based on total revenue.

73.    Defendants Imports, Motors, and Palm Beach are part of a 20-car dealership group owned and operated by Norman Braman and his family in South Florida. The three companies share corporate officers and a corporate mailing address. The company officers include Braman and his grandsons, Brian and Alex Shack.

74.    On April 9, 2020, Defendants Imports, Motors, and Palm Beach received approval for $14.5 million in First Draw PPP Loans for which they were not eligible because they are not small businesses.

75.    Federal law and regulations require applicants for PPP loans to certify that they are small business concerns that comply with the size standards published by the SBA. To qualify as a small business, new car dealers must certify that they employ fewer than 200 or have a net worth of $15 million or less, or an average net income of no more than $5 million over the previous two years. Defendants Palm Beach Imports, Braman Motors, and Braman Imports failed to meet either criterion.

76.     Contrary to federal regulations limiting loans to small business concerns, each Defendant employs more workers and generates more revenue and net income than allowed.

77.     SBA size standards categorize new car dealers, identified under the NAICS code 441110, with 200 or fewer employees as small businesses.  Loan applications submitted by Defendants Imports, Motors, and Palm Beach reported that each dealership employed more than 200. All three Defendants are classified under NAICS code 441110.

78.     The alternative size standard employed by SBA requires companies to have a tangible net worth of no more than $15 million or $5 million in net income over the previous two years to qualify as a small business. The Braman auto group generates revenue of $3 billion annually.

79.     The dealerships operated by the Defendants sell, among others, luxury brands such as Bentley, Bugatti, BMW, Porsche, and Rolls-Royce.

80.     The companies receiving these ineligible loans are listed in the following paragraphs.

81.     Defendant Imports of 7000 Coral Way in Miami obtained approval for a $2,376,900 loan, loan number 5587367009, on April 5, 2020, from City National Bank of Florida. On its application, the company certified how many workers it employed. The SBA reported that the company employed 224. On

January 26, 2022, upon the recommendation of the lender, the SBA forgave outstanding principal and interest totaling $2,419,163.

82.     Defendant Motors of 2060 Biscayne Blvd in Miami obtained approval for a $5,921,500 loan, loan number 5798567010, on April 6, 2020, from City National Bank of Florida. On its application, the company certified how many workers it employed. The SBA reported the company employed 405. On January 25, 2022, upon the recommendation of the lender, the SBA forgave outstanding principal and interest totaling $6,026,627.

83.     Defendant Palm Beach of 2060 Biscayne Blvd in Miami obtained approval for a $6,245,700 loan, loan number 1026057110, on April 9, 2020, from Truist Bank of Charlotte, North Carolina. On its application, the company certified how many workers it employed. The SBA reported the company employed 437. On January 25, 2022, upon the recommendation of the lender, the SBA forgave outstanding principal and interest totaling $6,356,785.

## DAMAGES

84.     Federal law and SBA regulations prohibited entities that did not meet the SBA size standards from obtaining First Draw PPP Loans. None of these Defendants met the size standards.

85.     The Defendants certified they were eligible for taxpayer-backed economic aid and that they complied with the laws and regulations governing the

22

PPP loan program when they did not. These certifications and assertions were false.

86.     Their false statements, certified as true and correct, enabled the Defendants to obtain PPP loans for which they were not eligible. Federal regulations and the application for loan forgiveness explicitly state that borrowers who were ineligible for a PPP loan are also ineligible for loan forgiveness.

87.     Yet, contrary to federal law and regulations, the Defendants applied for their debt to be forgiven, despite knowing that they were ineligible to seek or obtain forgiveness from taxpayers.

88.     The Defendants are liable to the United States for the $14.8 million in principal and interest on the loans forgiven by taxpayers and the $145,441 in fees the SBA paid lenders to process, evaluate, and issue the loans.

## COUNT I
## VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT
### 31 U.S.C. §§ 3729(a)(1)(A) and (B)

89.     Relator re-alleges and incorporates by reference every allegation contained in paragraphs 1-88 above as though fully set forth herein. As described in greater detail above, the Defendants exploited federal financial aid programs designed to support financially struggling small businesses during the pandemic. More specifically, the Defendants employed false and fraudulent statements and certified them as true to obtain PPP loans they were not eligible for or entitled to.

90. After receiving taxpayer-backed loans for which they were not eligible, the Defendants electronically transmitted loan forgiveness applications falsely certifying that they complied with the SBA size restrictions that determined loan eligibility.

91. Both the forgiveness application and federal regulations explicitly state that borrowers who received but were not qualified for PPP loans, or used the funds for unauthorized purposes, are not eligible for loan forgiveness.

92. The false and fraudulent assertions by the Defendants to lenders and the SBA resulted in taxpayers writing off $14.8 million in principal and interest that the Defendants owed and were required by federal law and regulations to pay.

93. Under the FCA, the Defendant violated:

   i.  31 U.S.C. § 3729(a)(1)(A) by knowingly presenting, or causing to be presented, a false or fraudulent claim for payment or approval; and

   ii. 31 U.S.C. § 3729(a)(1)(B) by knowingly making, using, or causing to be made or used, a false record or statement material to a false or fraudulent claim.

94. Because of the false claims made by the Defendants, the United States has suffered and continues to suffer damages and is therefore entitled to a recovery as provided by the FCA of an amount to be determined at trial, plus a civil penalty for each violation. The damages to date are at least $14.9 million, which represents

24

the loans given to entities exceeding the SBA size restrictions, and the lender fees associated with the loans.

**COUNT II**
**VIOLATIONS OF THE FEDERAL FALSE CLAIMS ACT**
**31 U.S.C. §§ 3729(a)(1)(G)**

95.    Relator re-alleges and incorporates by reference every allegation contained in paragraphs 1-88 as though fully set forth herein. As described in greater detail above, the Defendants certified false and fraudulent statements that they complied with size restrictions enacted by Congress as true and correct to obtain PPP loans and the forgiveness of the principal and interest they owed.

96.    Federal law and regulations required the Defendants to correctly certify the number of workers they employed and provide payroll records and other documentation supporting their loans and loan forgiveness applications. Defendants Imports, Motors and Palm Beach certified these submissions as accurate when they were false.

97.    SBA rules allowed lenders to rely on the certifications received from applicants to determine the amount borrowed and eligibility for PPP loans. The SBA relied upon the Defendants' false and fraudulent statements to authorize the lending.

98.    After receiving loans for which they were not eligible, the Defendants applied for and received taxpayer forgiveness for the principal and interest due,

25

despite regulations prohibiting ineligible borrowers from receiving loan forgiveness.

99.    The private lenders who issued the loans on behalf of the federal government and the SBA relied upon these false and fraudulent statements to award financial aid that would have otherwise been denied and to forgive the debt.

100.    The Defendants' false and fraudulent statements induced the SBA to authorize financial aid to ineligible borrowers and then forgive principal and interest -- debt relief to which the company was not entitled.

101.    The Defendants' fraudulent conduct violated 31 U.S.C. § 3729(a)(1)(G), which provides for liability under the FCA for any person who:

> knowingly makes, uses, or causes to be made or used, a false record or statement material to an obligation to pay or transmit money or property to the Government, or knowingly conceals or knowingly and improperly avoids or decreases an obligation to pay or transmit money or property to the Government.

## PRAYER

WHEREFORE, Relator, on behalf of the United States, respectfully requests that:

a.    This Court enters an order determining that Defendants violated the FCA by making false statements and records to cause false claims to be submitted to the United States;

26

b.      This Court enters an order requiring Defendants to pay the maximum civil penalties allowable to be imposed for each false or fraudulent claim presented to the United States;

c.      This Court enters an order requiring Defendants to cease and desist from violating the FCA;

d.      This Court enters an order requiring Defendants to pay all expenses, attorneys' fees, and costs associated with this action;

e.      This Court enters an order paying Relator the maximum statutory award for its contributions to the prosecution of this action; and

f.      This Court grants any and all other relief as this Court determines to be reasonable and just.

**PLAINTIFF/RELATOR DEMANDS A TRIAL BY JURY ON ALL COUNTS**

Dated: September 26, 2025                    Respectfully submitted,

*/s/ David C. Fulleborn*
David C. Fulleborn
Florida Bar No.: 1008507
dfulleborn@hoyerlawgroup.com
Sean Estes
Florida Bar No.: 0055770
sean@hoyerlawgroup.com
Hoyer Law Group, PLLC
2801 W. Busch Blvd., Suite 200
Tampa, Florida 33618
Tel.: (813) 375-3700
Fax: (813) 375-3710